UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
                              :

JEFF BITTNER, Individually and on Behalf of :   Civil Action No. 19-cv-1840
All Others Similarly Situated,                :
                              :

              Plaintiffs,      :   <u>CLASS ACTION</u>
                              :

        vs.                   :   COMPLAINT FOR VIOLATIONS OF THE
                              :   FEDERAL SECURITIES LAWS

PROSHARES TRUST II, PROSHARE       :
CAPITAL MANAGEMENT LLC, TODD B.   :
JOHNSON, EDWARD KARPOWICZ,     :
MICHAEL L. SAPIR, LOUIS M. MAYBERG, :
ABN AMRO CLEARING CHICAGO LLC,   :   <u>DEMAND FOR JURY TRIAL</u>
BANCA IMI SECURITIES CORP.,       :
BARCLAYS CAPITAL INC., BNP PARIBAS  :
SECURITIES CORP., CREDIT SUISSE    :
SECURITIES (USA) LLC, DEUTSCHE    :
BANK SECURITIES INC., GOLDMAN,    :
SACHS & CO., HRT FINANCIAL LLC,    :
JEFFERIES LLC, J.P. MORGAN        :
SECURITIES LLC, KNIGHT EXECUTION  :
& CLEARING SERVICES, LLC, MERRILL  :
LYNCH PROFESSIONAL CLEARING     :
CORP., MIZUHO SECURITIES USA LLC.,  :
NEWEDGE USA LLC, NOMURA        :
SECURITIES INTERNATIONAL, INC., RBC :
CAPITAL MARKETS, LLC, SG AMERICAS :
SECURITIES, LLC, TIMBER HILL, LLC,   :
UBS SECURITIES LLC, VIRTU         :
FINANCIAL BD LLC, and WEDBUSH    :
SECURITIES, INC.,                 :

              Defendants.
———————————————————— x

Plaintiff Jeff Bittner ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of ProShares Trust II ("ProShares" or the "Trust"), the Trust's press releases, and analyst reports, media reports and other publicly disclosed reports and information about the Trust. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who purchased ProShares Short VIX Short-Term Futures ETF ("SVXY" or the "Fund") securities pursuant to the May 15, 2017 registration statement (as amended, "Registration Statement"), seeking to pursue remedies under the Securities Act of 1933 (the "1933 Act"), and/or during the period from May 15, 2017 to February 5, 2018, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act").

## JURISDICTION AND VENUE

2.      The claims alleged herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o, and §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act, and §27 of the 1934 Act.

4.      Venue is proper in this District pursuant to §22 of the 1933 Act, §27 of the 1934 Act, and 28 U.S.C. §1391(b). SVXY shares trade and were distributed in this District, and

many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE Arca Equities, Inc. ("NYSE"), a national securities exchange.

## PARTIES

6.      Plaintiff Jeff Bittner purchased SVXY shares pursuant to the Registration Statement, as set forth in the accompanying certification incorporated herein by reference, and has been damaged thereby.

7.      Defendant ProShares Trust II (the "Trust") is the registrant for the Fund and issuer of SVXY shares.

8.      Defendant ProShare Capital Management LLC (the "Sponsor") is the sponsor and commodity pool operator for the Fund.

9.      Defendant Todd B. Johnson is the Principal Executive Officer of the Trust.

10.     Defendant Edward Karpowicz is the Principal Accounting Officer of the Trust.

11.     Defendant Michael L. Sapir is the Chief Executive Officer ("CEO") and a principal and director of the Sponsor.

12.     Defendant Louis M. Mayberg is a principal and director of the Sponsor.

13.     The defendants identified in ¶¶9-12 are referred to herein as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement.  In addition, as directors and/or executive officers of the Trust and/or the Sponsor, the Individual Defendants participated in the solicitation and sale of SVXY shares to investors in the Fund for their own benefit and the benefit of the Sponsor.

- 2 -

14.     The Individual Defendants, the Sponsor and the Trust and are referred to herein as the "ProShares Defendants."

15.     Defendants ABN AMRO Clearing Chicago LLC, Banca IMI Securities Corp., Barclays Capital Inc., BNP Paribas Securities Corp., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Goldman, Sachs & Co., HRT Financial LLC, Jefferies LLC, J.P. Morgan Securities LLC, Knight Execution & Clearing Services, LLC, Merrill Lynch Professional Clearing Corp., Mizuho Securities USA LLC, Newedge USA LLC, Nomura Securities International, Inc., RBC Capital Markets, LLC, SG Americas Securities, LLC, Timber Hill, LLC, UBS Securities LLC, Virtu Financial BD LLC, and Wedbush Securities, Inc. (collectively referred to as the "Underwriter Defendants") served as underwriters for the offer and sale of SVXY shares during the Class Period.  Each of the Underwriter Defendants has executed an Authorized Participant Agreement with the Trust and Sponsor for the sale of SVXY shares to the public, and the Underwriter Defendants received fees, commissions and/or profits from these sales.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action on behalf of all persons or entities who purchased SVXY securities pursuant to the Registration Statement and/or during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers, directors and affiliates of the defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable.  Fund shares are actively traded on the NYSE under the ticker symbol "SVXY"

and millions of shares were sold throughout the Class Period.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Trust or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

18.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

       a)     whether defendants violated the 1933 Act and/or the 1934 Act;

       b)     whether statements made by defendants to the investing public in the Registration Statement and during the Class Period about the business, operations and risks of investing in the Fund were false and misleading; and

       c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS COMMON TO ALL CLAIMS

**Background to the Fund**

22.     The Trust is a Delaware statutory trust organized into separate series of exchange-traded funds, or "ETFs."  ETFs are investment funds that bundle together securities to offer investors the ability to invest in diversified portfolios, much like mutual funds.  However, while mutual funds trade only at the end of day net asset value ("NAV") price, ETF shares trade on stock exchanges throughout the trading day, like stocks.  An ETF holds assets such as stocks, commodities, or bonds, and they are usually designed to keep their market price close to their NAV per share.  Most ETFs track an index, such as a stock index or bond index.  Inverse ETFs seek to deliver the opposite of the performance of the index or benchmark they track.

23.     The CBOE Volatility Index, or "VIX," seeks to measure the expected volatility of the S&P 500.  Volatility is the range of price change a security experiences over a given period of time.  If the price remains relatively stable, the security has low volatility.  If its price fluctuates, the security has greater volatility.  Because the VIX measures expected market swings and uncertainty, it is sometimes referred to as the market "fear gauge."  Cboe Global Markets, Inc. ("CBOE") calculates the VIX pursuant to a complicated formula that takes as inputs the market prices of call and put options on the S&P 500 index with an average expiration of 30 days.

24.     The Fund is benchmarked to the S&P 500 VIX Short-Term Futures Index (the "Index"), an investable index of VIX futures contracts with the ticker symbol "SPVXSPID."

- 5 -

Specifically, the VIX futures contracts comprising the Index represent the prices of two near-term VIX futures contracts, replicating a position that rolls the nearest month VIX futures to the next month VIX futures on a daily basis in equal fractional amounts.  This results in a constant weighted average portfolio maturity of one month.

25.     The investment objective for the Fund during the Class Period was to achieve results for a single day that matched (before fees and expenses) the inverse (-1x) of the daily performance of the Index.  For example, if the Index decreased 5% on a given day due to low market volatility, the investment objective of the Fund was to increase 5% that same day.  This would be accomplished by the buying and selling of VIX future contracts during the trading day. As of the NAV calculation time each trading day (typically 4:15 pm ET), the Fund Sponsor would seek to ensure that the portfolio of VIX future contracts owned by the Fund was rebalanced to maintain the appropriate -1x leverage consistent with the Fund's investment objective.

26.     Investors cannot invest directly in the VIX, but instead must invest in securities such as the SVXY tied to the VIX.  Investing in such volatility-related products can be used as a means to hedge investment risks and diversify an investment portfolio.  For example, the Registration Statement described the SVXY (which the Registration Statement labeled a "geared fund" due to the Fund's inverse leverage) as follows:

> Daily objective geared funds, if used properly and in conjunction with the investor's view on the future direction and volatility of the markets, ***can be useful tools for investors who want to manage their exposure to various markets and market segments*** and who are willing to monitor and/or periodically rebalance their portfolios.

27.     Throughout the Class Period, the Trust continuously offered and redeemed shares of the Fund in blocks of 50,000 shares, dubbed "Creation Units."  Creation Units were distributed to the investing public by the Trust and Sponsor through the Underwriter Defendants.

The Underwriter Defendants received Creation Units at the Fund's NAV and then offered the shares from these Creation Units to the investing public at a per-share market price. The Underwriter Defendants received profits from the spread between the NAV at which they received Fund shares from the Trust and the market price at which the shares were sold to the investing public. For example, if the SVXY was trading at a premium to NAV, the Underwriter Defendants would request additional Creation Units from the Trust at the lower NAV and sell shares from these Creation Units to investors at the higher market price. If the SVXY was trading at a discount to NAV, the Underwriter Defendants would purchase shares at the lower market price in order to redeem Creation Units derived from these shares from the Trust at the higher NAV. In addition, the Underwriter Defendants received certain brokerage fees and commissions from the sale of SVXY shares to investors.

**The Fund Is Subject to Extreme Undisclosed Risks**

28.     Throughout the Class Period, the Fund was subject to extreme risks that were not adequately disclosed to investors. While defendants told investors in the Fund that the SVXY was appropriate for managing daily trading risks, in fact the Fund was inappropriate for this purpose as it was subject to a high likelihood of catastrophic losses *in a matter of minutes*. No reasonable investor would have invested in the SVXY at prevailing market prices had the true risks and significant likelihood of catastrophic losses been disclosed by defendants. During the Class Period, an investment in SVXY was like picking up pennies in front of the proverbial steamroller. Historically low volatility, a short-volatility market imbalance and a glut of inverse exchange-traded volatility products (including the SVXY) subject to daily rebalancing made the SVXY a ticking time bomb that was set to self-destruct on significant market turbulence. While these risks manifested and increased during the Class Period, defendants failed to appropriately update the Fund's risk disclosures, misleading investors into believing that the Fund was just as

risky as it had always been even as conditions had significantly changed and thereby exposed investors to a substantial likelihood of suffering catastrophic losses.

29.   Beginning in early 2017, markets entered a period of historically low volatility. By May 2017, the VIX had closed below 10, less than half its historical average of approximately 20.  Over the course of 2017, volatility remained abnormally low.  According to analysis performed by the investment bank Goldman Sachs, the S&P 500 had a realized volatility score of 7 during 2017, which "'ranked in the first percentile since 1930.'"  Of the 56 lowest closing levels in the history of the VIX since 1990, 47 of them occurred in 2017.  The following charts illustrate the sharp decline in the level of the VIX during 2017 on daily and annualized bases, respectively:





30.     As with the VIX, the Index to which the Fund was benchmarked also declined during 2017 and remained at historically low levels throughout the year.  The following chart illustrates the abnormally low level of the Index during 2017:



- 9 -

31.     The historically low market volatility during the Class Period meant that even a relatively modest increase in the absolute value of the Index could cause the Index to increase significantly on a percentage basis.  This, in turn, would cause a proportional decrease in the value of SVXY shares.

32.     At the same time, investments in exchange-traded products, or "ETPs," and other financial instruments used to trade volatility dramatically increased.  Hundreds of millions of dollars' worth of invested capital flowed into VIX-related ETPs by the start of the Class Period, as the number of ETPs tied to volatility increased to nearly 40 such products.  SVXY was among the largest.  By May 31, 2017, aggregate gross capital subscriptions in the Fund had increased to $7.9 billion, from $5.1 billion as of July 31, 2016.  This massive inflow into the Fund continued throughout the Class Period.  From December 31, 2016, to December 31, 2017, total Fund assets increased 257%, from $228.6 million to $816.3 million.

33.     As a consequence of this growth in volatility trading, the markets for VIX futures contracts, S&P 500 Index ("SPX") options, and other volatility-related financial products, such as variance swaps, ballooned.  ETP portfolio managers such as the Sponsor and other consumers of volatility-related financial instruments used these products to maintain portfolio leverage and maturity consistent with volatility investment objectives, hedge risks and place directional bets on volatility.  In addition, many of the ETPs were leveraged, with investment objectives that sought to achieve some multiple of the underlying volatility index (generally 2x).  Like inverse ETPs, ETPs with leveraged multiples require daily rebalancing, which ordinarily involves the buying and selling of VIX future contracts at the end of the trading day.

34.     The proliferation of volatility-related products that relied on dynamic trading in the same VIX futures and SPX option markets – in particular inverse and leveraged ETPs –

created an acute liquidity risk that ensured the Fund would not perform as advertised in the face of significant market turbulence.  At the end of every trading day, inverse and leveraged ETPs needed to purchase VIX futures in order to rebalance their respective portfolios and maintain the appropriate leverage ratios.  Given the billions of dollars that had been invested in such ETPs prior to and during the Class Period (in addition to the billions of dollars invested in similar strategies outside of ETPs), any significant movement in the SPX would cause on outsized movement in VIX future contracts as market participants rushed to cover short positions, hedge risks and rebalance investment portfolios in overly crowded volatility markets.  There were simply not enough VIX futures contracts available from liquidity providers to absorb such an event without a run on the market.

35.     Particularly at risk of catastrophic losses were inverse ETPs such as the SVXY. Overall investment in VIX futures during the Class Period was net short, as investors piled billions of dollars into bets on low volatility.  As a result, the Fund faced heightened demand in the products it needed to purchase as part of its daily rebalancing.  Furthermore, the Fund rebalanced its portfolio at the end of each trading day and around the same time as other ETPs. This meant that the SVXY would generally be purchasing VIX future contracts at times when demand was highest.  In addition, the Fund was subject to the risk of front-running by sophisticated market participants with access to proprietary market data and non-public modelling capabilities who had visibility into the Fund's rebalancing needs based on market movements during the trading day.

36.     As would later be revealed, these massive and undisclosed risks threatened the Fund's very viability.  All of these factors set the stage for the Fund to suffer a self-destructive feedback loop if faced with market turbulence:  if volatility significantly increased, market

participants (including the Fund) would rush to transact in volatility-related products, which would drive up volatility, thereby driving up the price of VIX future contracts, thereby decreasing the Fund's NAV, thereby necessitating that the Fund buy even more VIX future contracts at higher prices as part of its daily rebalancing (along with other VIX ETPs), which would drive up volatility, and so on until the Fund collapsed or suffered catastrophic losses. The exponential growth of the SVXY before and during the Class Period increased these concerns and the likelihood that the Fund would suffer enormous losses, even as defendants pocketed millions of dollars from the management of the Fund and sale of Fund shares.

37.     The complexity of the Fund concealed and magnified these risks, which were poorly understood even by sophisticated traders. Many (if not most) of the investors in the SVXY were retail investors who did not have access to non-public predictive models, sophisticated analytical tools, or the massive amounts of data (which included proprietary and non-public data) necessary to comprehend the true risks of the Fund or how it would actually perform in stress scenarios. Defendants – the creators, portfolio managers and distributors of the Fund – possessed unique knowledge about the risks faced by the Fund throughout the Class Period, yet failed to apprise investors about these risks. To the contrary, the Registration Statement stated that investors in the Fund faced a risk of loss "*[a]s with all investments*." However, the SVXY was not like all investments. In light of the low volatility environment, design of the Fund, and the unique liquidity risks faced by the Fund during the Class Period, investors in the Fund were subject to an extreme risk of catastrophic loss. When the market faced significant turbulence – as it inevitably would – the SVXY was essentially designed to self-destruct.

**February 5, 2018: The "Volpocalypse"**

38.     On Monday, February 5, 2018, the stock market declined, with the SPX dropping 4% amid concerns about rising bond yields and higher inflation.  On a percentage basis, this decline was less than half the greatest single-day decline in the SPX over the last 30 years (a 9% decline that occurred on October 15, 2008) and a fraction of the 20% decline in the SPX that occurred on October 19, 1987.  While bid/ask spreads for SPX options widened during the sharpest portions of the equity market decline, trading was orderly, positions remained liquid, and there was not widespread market disruption in SPX options.

39.     However, the market turbulence triggered the latent self-destruct mechanism concealed in the SVXY, as the crowded market for VIX future contracts spiraled out of control. The VIX rocketed upward to a high of 38.80 during the day, from a close of 17.31 on Friday, February 2, 2018 – a 124% daily spike.  Much of this increase occurred at the end of the trading day, as reflected in the following chart:



40.     The Index experienced a similar surge, as the price of the VIX futures contracts

on which it was based jumped at the end of the trading day:



41.     The price of SVXY shares, which track the inverse of the Index, declined. By the

close of trading on February 5, 2018, the price of SVXY had dropped to $71.82 per share, from

the prior close of $105.60 per share, a 32% decline.  However, the real carnage occurred in the

afterhours as the Sponsor and other ETP portfolio managers sought to rebalance ETP portfolios

to maintain appropriate leverage amounts in an illiquid VIX futures market.  As the Sponsor and

other market participants purchased hundreds of millions of dollars' worth of VIX futures

contracts, prices skyrocketed, initiating the aforementioned death spiral and eviscerating the

value of SVXY shares.

42.     The following chart illustrates the dramatic rise in the price of March VIX futures, which occurred almost entirely after NYSE market close at 4:00 pm ET:



43.     This upsurge in the price of VIX future contracts created a price dislocation due to the rebalancing of the SVXY and the portfolios of other inverse and leveraged volatility ETPs. This dislocation occurred between 4:00 pm and 4:15 pm ET, concurrent with the rebalancing of the Fund's and other ETP's portfolios, as demonstrated by the following chart:



44.     By market open on February 6, 2018, the price of SVXY shares had plummeted to a low of $11.11, a one-day decline of **90%** from the prior day's high of $107.19 per share.  The SVXY essentially became the engine of its own demise, as investors suffered massive losses not primarily due to volatility in equity markets, but due to the Fund's own flawed design and its

price insensitive participation in – and catalyst for – an illiquid VIX futures market.   The following chart illustrates the dramatic decline in the price of SVXY:



45.   Investor losses were staggering.   In a matter of minutes, billions of dollars invested in inverse and leveraged ETPs – including hundreds of millions of dollars' worth of SVXY investments – evaporated in one of the greatest wealth-destruction events since the 2008 financial crisis.   Media commentators described the shocking and complete collapse of the SVXY and similar products in suitably cataclysmic terms such as "Armageddon" and the "Volpocalypse."   Others noted that investors had been "blindsided" as latent risks in the SVXY and other inverse and leveraged ETPs materialized, exposing fatal design flaws that made the products far riskier than disclosed by defendants.

46.     As a consequence of the market wreckage, trading in the SVXY was temporarily halted by market regulators.  Several inverse ETPs wound down in the days that followed, with one issuer, Nomura Holdings Inc., stating that it "'sincerely apologize[d] for causing significant difficulties to investors.'"  The Sponsor was far less contrite, issuing a curt statement that nonetheless recognized that the extreme risks exposed on Monday, February 5, 2018 had existed in the Fund all along – indeed existed *by design* – and were not the result of some aberrant market event.  According to the Sponsor, "'the performance on Monday of the ProShares Short VIX Short-Term Futures ETF (SVXY) was consistent with its objective and reflected the changes in the level of its underlying index.'"

47.     Soon after its belated acknowledgement of the Fund's true risks, the Sponsor abruptly changed the Fund's investment objective.  This act essentially acknowledged that the design of the Fund was fundamentally flawed and had exposed investors to unreasonable risks during the Class Period.  Despite the fact that market liquidity risks had been dramatically reduced by the events of February 5, 2018 (for example, due to the destruction of billions of dollars' of worth of VIX ETP investments), the Sponsor cut the Fund's inverse leverage *in half* because it was still far too risky to be traded by the Fund's investors.

48.     On February 27, 2018, the Sponsor announced that the SVXY's new investment objective would be to seek results (before fees and expenses) that correspond to one-half the inverse (-0.5x) of the Index for a single day.  In a statement filed with the SEC, the Sponsor described the change as follows:

> •     The Sponsor believes the change to each Fund's investment objective . . . is appropriate and consistent with the best interest of each Fund and Fund shareholders in light of recent extreme changes in the value of the . . . Index. As a result of the change to each Fund's investment objective, the Sponsor expects the risk profile and volatility of each Fund to be significantly reduced.

49.     This belated de-risking of the SVXY in "the best interest" of Fund shareholders came only *after Bloomberg* reported that both the SEC and the CFTC were investigating whether wrongdoing contributed to steep losses for VIX ETPs on February 5, 2018.   Later, FINRA launched its own investigation into whether broker dealers, a category that includes the Underwriter Defendants, made unsuitable recommendations and misrepresentations or failed to make required disclosures to investors in VIX-related ETPs such as the Fund.   While the Sponsor may now seek to mitigate regulatory scrutiny, its failure to fully disclose the true risks of the Fund during the Class Period has caused SVXY investors to suffer hundreds of millions' of dollars in economic losses and damages under the federal securities laws.

### 1933 ACT ALLEGATIONS

### FALSE AND MISLEADING STATEMENTS IN THE REGISTRATION STATEMENT

50.     On May 15, 2017, the Trust filed the Registration Statement on Form S-3, as amended, which was incorporated into and formed part of the July 13, 2017 Prospectus filed on Form 424B3 (the "Registration Statement").

51.     The Registration Statement was negligently prepared and as a result contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

*52.*     Specifically, the Registration Statement failed to disclose that the Fund was certain to suffer catastrophic losses when faced with significant market turbulence as a result of the Fund's flawed design and the low-volatility environment and acute liquidity risks that existed during the Class Period.   Instead, the Registration Statement stated that the Fund, "if used properly and in conjunction with the investor's view on the future direction and volatility of the

markets, *can be [a] useful tool[] for investors who want to manage their exposure to various markets and market segments and who are willing to monitor and/or periodically rebalance their portfolios*." This statement was materially false and misleading because even investors who used the Fund to express a correct view on volatility and monitored and rebalanced their portfolios regularly suffered catastrophic losses that dwarfed any potential returns or risk management utility.  The Fund lost essentially its entire returns over the preceding *six-and-a-half years* in a matter of minutes.  In addition, investors who purchased SVXY shares at the end of the trading day on February 5, 2018 would have been correct that volatility would subsequently recede, yet nevertheless lost almost the entirety of their investment in aftermarket trading.

*53.*     Similarly, the Registration Statement provided the investment objective of the Fund and stated that the Sponsor would achieve this objective "through the appropriate amount of exposure to the VIX futures contracts included in the Index," but failed to disclose the fact that the Fund's price-insensitive investment in these VIX future contracts in order to achieve its objective ensured that the Fund would self-destruct when faced with significant market turbulence.  The Registration Statement stated in pertinent part:

> The Inverse Fund seeks results (before fees and expenses) that correspond to the inverse (-1x) of the performance of the Index for a single day. . . .
>
> •     *The Funds seek to achieve their respective investment objectives through the appropriate amount of exposure to the VIX futures contracts included in the Index*.
>
> 1.          *          *          *
>
> •     The Sponsor does not invest the assets of the Funds based on its view of the investment merit of a particular investment, other than for cash management purposes, nor does it conduct conventional volatility research or analysis, or forecast market movement or trends in managing the assets of the Funds. Each Fund generally seeks to remain fully invested at all times in Financial Instruments and money market instruments that, in combination,

provide exposure to the Index consistent with its investment objective without regard to market conditions, trends or direction.

*54.*     In addition, while the Registration Statement stated that an investment in the Fund involved "risks" and that an investor "could potentially lose the full principal value of his/her investment, even over periods as short as one day," the Registration Statement significantly qualified these statements by stating that these risks were "*[a]s with all investments*." This statement was materially false and misleading because an investment in the Fund was exposed to risks that far exceeded those of most other investments, including a high likelihood that the Fund would collapse in a matter of minutes if faced with significant market turbulence.  This was especially true as compared to other investments sold to the general investing public, rather than those only offered for sale to sophisticated institutional investors with the extensive resources, proprietary data access and analytical capabilities necessary to perform independent due diligence of the extraordinarily complex and interrelated volatility markets that impacted the value of the Fund.

55.     The Registration Statement also included numerous contra-indicators that suggested that the Fund was far less risky than it in fact was.  For example, the Registration Statement provided an analysis of various potential returns over the course of one year in a variety of market scenarios.  The ***worst-case scenario*** provided in a chart illustrating potential Fund returns in the Registration Statement was the loss of 61.7% of Fund value over the course of one year.  As would later be revealed, the actual worst-case scenario in light of the true risks facing the Fund was the near-complete loss of Fund value in a matter of minutes.  The following table reflecting the Fund's purported returns analysis, which failed to accurately convey the true risks of the Fund, was provided in the Registration Statement:

Estimated Fund Return Over One Year When the Fund Objective is to Seek Investment Results For a single day, Before Fees and Expenses, that Correspond to the Inverse (-1x) of the Daily Performance of an Index.

| One Year Index Performance | Inverse of One Year Index Performance | Index Volatility | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 0% | 6% | 10% | 16% | 20% | 26% | 30% | 36% | 40% | 46% | 50% | 56% | 60% | 66% | 70% |
| -60% | 60% | | | | | | | | | | | | | | | |
| -55% | 55% | | | | | | | | | | | | | | | |
| -50% | 50% | | | | | | | | | | | | | | | |
| -45% | 45% | | | | | | | | | | | | | | | |
| -40% | 40% | | | | | | | | | | | | | | | |
| -35% | 35% | | | | | | | | | | | | | | | |
| -30% | 30% | | | | | | | | | | | | | | | |
| -25% | 25% | | | | | | | | | | | | | | | |
| -20% | 20% | | | | | | | | | | | | | | | |
| -15% | 15% | | | | | | | | | | | | | | | |
| -10% | 10% | | | | | | | | | | | | | | | |
| -5% | 5% | | | | | | | | | | | | | | | |
| 0% | 0% | | | | | | | | | | | | | | | |
| 5% | -5% | | | | | | | | | | | | | | | |
| 10% | -10% | | | | | | | | | | | | | | | |
| 15% | -15% | | | | | | | | | | | | | | | |
| 20% | -20% | | | | | | | | | | | | | | | |
| 25% | -25% | | | | | | | | | | | | | | | |
| 30% | -30% | | | | | | | | | | | | | | | |
| 35% | -35% | | | | | | | | | | | | | | | |
| 40% | -40% | | | | | | | | | | | | | | | |
| 45% | -45% | | | | | | | | | | | | | | | |
| 50% | -50% | | | | | | | | | | | | | | | |
| 55% | -55% | | | | | | | | | | | | | | | |
| 60% | -60% | | | | | | | | | | | | | | | |

56.     The Registration Statement provided various generic statements of potential or contingent risk, yet failed to disclose that these and other risks had already materialized during the Class Period such that the Fund was certain to experience catastrophic losses in the event of an uptick in market turbulence.  For example, the Registration Statement stated that the Fund and other funds in its ETF family "present many different risks than other types of funds, including risks relating to investing in VIX futures and, with respect to the Geared Funds, risks associated with the use of leverage," and that these "investments can be highly volatile and the Funds *may* experience large losses from buying, selling or holding such investments."   Similarly, the Registration Statement stated that the "Geared Funds *may* be subject to increased trading costs associated with daily portfolio rebalancings in order to maintain appropriate exposure to the Index" and that "[m]arket illiquidity *may* cause losses for the Funds."   The Registration Statement failed to disclose that the Fund *already* faced liquidity constraints, a heightened likelihood of catastrophic losses due to the low volatility environment, and a crowded VIX futures contract market poised to exacerbate investor losses in the event of a market downturn, rendering the discussions of contingent and potential future harm that "may" occur as provided in the Registration Statement themselves materially misleading.

57.     Furthermore, the types of generic risk disclosures provided in the Registration Statement were only those categories of risks that had always existed in the Fund and other similar ETPs.  Nowhere did the Registration Statement disclose that these and other risks had dramatically increased and metastasized before and during the Class Period, and that, in light of the Fund's flawed design, the historically low volatility environment, the proliferation of volatility trading and inverse and leveraged ETPs, and the market's short volatility bias ensured that investors would suffer catastrophic losses in the event of significant market turbulence. The failure of the Registration Statement to disclose the concrete and specific risks that existed for investors in the Fund during the Class Period created the misleading impression that the Fund had not encountered substantial new risks that threatened investors in the Fund as compared to prior periods.

58.     Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), requires defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."   The failure of the Registration Statement to disclose that the historically low volatility environment and liquidity risks faced by the Fund ensured that investors would face catastrophic losses in a turbulent market environment violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed risks were known to the Fund and would (and did) have an unfavorable impact on the Trust's revenues and income from continuing operations.  This failure also violated 17 C.F.R.

- 23 -

§229.503(c), because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in SVXY shares speculative or risky.

**COUNT I**

**For Violations of §11 of the 1933 Act**
**Against All Defendants**

59.     Plaintiff repeats and realleges ¶¶1-58 by reference.

60.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

61.     This Count does not sound in fraud.  Plaintiff does not allege that the ProShares Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

62.     The Registration Statement was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

63.     The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

64.     The Trust is the registrant for the SVXY shares sold during the Class Period.  As the issuer of the shares, the Trust is strictly liable to plaintiff and the Class for the misstatements and omissions.

65.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

66.     By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

67.     Plaintiff purchased SVXY shares pursuant to the Registration Statement.

68.     Plaintiff and the Class have sustained damages.  The value of SVXY shares has declined substantially subsequent to and due to defendants' violations.

69.     At the time of their purchases of Fund shares, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### For Violation of §15 of the 1933 Act
### Against the ProShares Defendants

70.     Plaintiff repeats and realleges ¶¶1-69 by reference.

71.     This Count is brought pursuant to §15 of the 1933 Act against the Trust, the Sponsor and the Individual Defendants.

72.     The Individual Defendants were each control persons of the Trust by virtue of their positions as directors, senior officers and/or principals of the Trust or the Sponsor.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of the Trust.  The Individual Defendants signed the Registration Statement and were responsible for its contents. The Sponsor controlled the Trust as its commodity pool operator and fund manager.  The Trust and the Sponsor also controlled the Individual Defendants and all of their employees.

- 25 -

73.     The defendants named herein each were culpable participants in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement, selling SVXY shares and/or having otherwise participated in the process that allowed the offer and sale of SVXY to investors be successfully completed.

## 1934 ACT ALLEGATIONS

### FALSE AND MISLEADING STATEMENTS
### DURING THE CLASS PERIOD

74.     The Class Period begins on May 15, 2017.  On that date, defendants filed the Registration Statement.  For the reasons alleged in ¶¶52-58, the Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

75.     The ProShares Defendants continued to make materially false and misleading statements to investors in the Fund throughout the Class Period.  Specifically, the ProShares Defendants filed numerous financial reports and draft prospectuses and/or registration statements with the SEC during the Class Period that contained many of the same misstatements and failures to disclose as the Registration Statement.  These filings included:

        a)      a quarterly report on Form 10-Q for the Trust for the period ended June 30, 2017, filed on August 9, 2017;

        b)      a quarterly report on Form 10-Q for the Trust for the period ended September 30, 2017, filed on November 9, 2017; and

        c)      a registration statement on Form S-3 for the sale of additional shares of SVXY filed on September 28, 2017 and amended on February 1, 2018.

- 26 -

76.     These documents (together with the Registration Statement, the "Class Period Filings") contained materially false and misleading statements substantially the same as those contained in the Registration Statement, which misrepresented the true risks of the Fund and falsely represented to investors that an investment in the Fund was an appropriate means for managing trading risks.  Specifically, the Class Period Filings failed to disclose that the Fund was certain to suffer catastrophic losses when faced with significant market turbulence as a result of the Fund's flawed design and the low-volatility environment and acute liquidity risks that existed during the Class Period.  To the contrary, the Class Period Filings stated that, "if used properly and in conjunction with the investor's view on the future direction and volatility of the markets," the Fund "*can be [a] useful tool[] for investors who want to manage their exposure to various markets and market segments and who are willing to monitor and/or periodically rebalance their portfolios*."  Similarly, the Class Period Filings stated that the Sponsor would achieve the Fund's investment objective "through the appropriate amount of exposure to the VIX futures contracts included in the Index," but failed to disclose the fact that the Fund's price-insensitive investment in these VIX futures contracts in order to achieve its objective ensured that the Fund would self-destruct when faced with significant market turbulence.

77.     The Class Period Filings also included numerous contra-indicators that suggested that the Fund was far less risky than it in fact was, for example, providing an analysis of various potential returns over the course of one year that suggested that the *worst-case scenario* for an investment in Fund was the loss of 61.7% of value over the course of one year.  Similarly, while the Class Period Filings stated that an investment in the Fund involved "risks" and that an investor "could potentially lose the full principal value of his/her investment, even over periods

as short as one day" the Class Period Filings misleadingly qualified these statements by stating that these risks were "*[a]s with all investments*."

78.     Moreover, the Class Period Filings provided various generic statements of potential or contingent risk, yet failed to disclose that these and other risks had already materialized during the Class Period such that the Fund was certain to experience catastrophic losses in the event of an uptick in market turbulence.  The Class Period Filings failed to disclose that the Fund *already* faced liquidity constraints, a heightened likelihood of catastrophic losses due to the low volatility environment, and a crowded VIX futures contract market poised to exacerbate investor losses in the event of a market downturn, rendering the discussions of contingent and potential future harm that "may" occur as provided in the Class Period Filings themselves materially misleading.

79.     Furthermore, the types of generic risk disclosures provided in the Class Period Filings were only those categories of risks that had always existed in the Fund and other similar ETPs.  Nowhere did the Class Period Filings disclose that these and other risks had dramatically increased and metastasized before and during the Class Period, and that, in light of the Fund's flawed design, the historically low volatility environment, the proliferation of volatility trading and inverse and leveraged ETPs, and the market's short volatility bias ensured that investors would suffer catastrophic losses in the event of significant market turbulence. The failure of the Class Period Filings to disclose the concrete and specific risks that existed for investors in the Fund during the Class Period created the misleading impression that the Fund had not encountered substantial new risks that threatened investors in the Fund with the imminent catastrophic losses due to the then-existing market dynamics that had emerged throughout the Class Period.   Moreover, the Class Period Filings' failures to disclose the Fund's true risks

violated Item 303 and Item 503 because these undisclosed risks were known to the Fund and would (and did) have an unfavorable impact on the Trust's revenues and income from continuing operations and involved some of the most significant factors that made an investment in SVXY shares speculative or risky.

80.     The ProShares Defendants knew, or at the very least were reckless in not knowing, that the statements identified in ¶¶76-79 were materially false and misleading when made.  The ProShares Defendants had created the Trust and the Fund, designed its investment objective, assessed the risks and likely performance of the Fund, and were responsible for the daily management of the Fund's investments.  As stated in the Registration Statement:

> •     In seeking to achieve the Funds' investment objectives, the Sponsor uses a mathematical approach to investing. Using this approach, the Sponsor determines the type, quantity and mix of investment positions that the Sponsor believes, in combination, should produce daily returns consistent with the Funds' objectives. The Sponsor relies upon a pre-determined model to generate orders that result in repositioning the Funds' investments in accordance with their respective investment objective.

81.     As a result of their role in creating and maintaining the Fund, dynamic investing of Fund assets, continuous offering and redemption of Fund shares, and access to necessary investments and market data (including data proprietary to the Fund), the ProShares Defendants possessed unique knowledge about the specific and imminent risks facing the Fund during the Class Period, including the undisclosed risks of catastrophic losses as alleged herein.

82.     Moreover, the Individual Defendants made, or caused to be made, the false and misleading statements that artificially inflated the price of SVXY shares, including by signing the Class Period Filings.  The Individual Defendants, because of their positions with the Trust, possessed the power and authority to control the contents of the Trust's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Fund's statements alleged

herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Trust and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

83.     In addition, the ProShares Defendants had the motive and opportunity to commit fraud and were highly incentivized to induce investors to commit assets to the Fund by concealing the true risks of such investments.  Specifically, the Sponsor received fees for its management of Fund assets, paid monthly in arrears, in an amount equal to 0.95% per annum of the Fund's average daily net assets.  Thus, the fees received by the Sponsor were directly related to the amount of assets invested in the Fund.  As a result, as the Fund grew substantially in size over the course of 2017, the amount of management fees paid to the Sponsor from Fund assets *increased by 60%* year-over-year.  The Individual Defendants as principals of the Sponsor and/or employees of the Trust were similarly highly incentivized to grow investments in the Fund during the Class Period.

84.     The strategy of the ProShares Defendants to market and grow the Fund was a success.  The SVXY became one of the largest ETFs managed by the Sponsor, with over $1 billion in assets under management near the end of the Class Period.  If the ProShares Defendants had disclosed the true risks of the Fund during the Class Period, the Sponsor would have received substantially less fees from one of the largest and most lucrative ETFs offered by the Trust.

## LOSS CAUSATION AND ECONOMIC LOSS

85.    As detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of SVXY shares and operated as a fraud or deceit on purchasers of SVXY shares.   As detailed above, when the truth about defendants' misconduct was revealed, the value of SVXY shares declined precipitously as the prior artificial inflation no longer propped up the Fund's prices.   The declines in the prices of SVXY shares were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.   The timing and magnitude of the share price declines negate any inference that the loss suffered by plaintiff was caused by changed market conditions, macroeconomic or industry factors or Fund-specific facts unrelated to the defendants' fraudulent conduct.   The economic loss, *i.e.*, damages, suffered by plaintiff, was a direct result of defendants' fraudulent scheme to artificially inflate the prices of SVXY shares and the subsequent significant decline in the value of the Fund's shares when defendants' prior misrepresentations and other fraudulent conduct were revealed.

86.    At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the Fund's business and operations, as alleged herein.  Before and during the time of plaintiff's purchases of SVXY shares, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the prices of SVXY shares to be artificially inflated.  Plaintiff purchased SVXY shares at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

87.     At all relevant times, the market for SVXY shares was an efficient market for the following reasons, among others:

    a)     SVXY shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

    b)     according to the Trust's Form 10-K for its fiscal year 2017, filed on March 1, 2018, the Fund sold over 52.5 million SVXY shares in 2017 alone, demonstrating a very active and broad market for SVXY shares;

    c)     as a regulated issuer, the Trust filed periodic public reports with the SEC;

    d)     the ProShares Defendants regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

    e)     unexpected material news about the Fund was rapidly reflected in and incorporated into the price of the Fund's shares.

88.     As a result of the foregoing, the market for SVXY shares promptly digested current information regarding the Fund from publicly available sources and reflected such information in the price of SVXY shares.  Under these circumstances, a presumption of reliance applies to plaintiff's purchases of Fund shares.

89.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding the Fund's

business and operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

90.   Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements ("FLS"), or were not identified as such by defendants, but rather, were statements of historical and present fact, and thus did not fall within any "Safe Harbor."

91.   Defendants' verbal "Safe Harbor" warnings accompanying any of their oral FLS failed to provide meaningful cautionary statements regarding the specific facts and circumstances facing the Fund, and thus were ineffective to shield those statements from liability.

92.   Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of the Trust or the Sponsor who knew that the FLS was false.  Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## COUNT III

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against the ProShares Defendants

93.   Plaintiff incorporates the foregoing paragraphs by reference.

94.     The Trust, the Sponsor and the Individual Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95.     These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

        a)     Employed devices, schemes and artifices to defraud;

        b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and Class members in connection with their purchases of SVXY shares.

96.     Plaintiff has suffered damages in that, in reliance on the integrity of the market, plaintiff paid artificially inflated prices for SVXY shares.  Plaintiff would not have purchased SVXY shares at the price paid, or at all, if plaintiff had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

97.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class suffered damages in connection with their purchases of SVXY shares.

## COUNT IV

### For Violation of §20(a) of the 1934 Act
### Against the ProShares Defendants

98.     Plaintiff incorporates the foregoing paragraphs by reference.

99.     The ProShares Defendants were control persons within the meaning of §20(a) of the 1934 Act.

100.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Trust's operations and/or intimate knowledge of the false and misleading statements filed by the Trust with the SEC and disseminated to the investing public, the Sponsor and the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Trust, including the content and dissemination of the various statements plaintiff contends are false and misleading. The Sponsor and the Individual Defendants were provided with, or had, unlimited access to copies of the Trust's reports, press releases, public filings and other statements alleged by plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  The Trust and the Sponsor, meanwhile, controlled the Individual Defendants and all of their employees.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

(i)    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(ii)    Awarding plaintiff and the Class compensatory damages at an amount to be determined at trial and pre-judgment and post-judgment interest thereon;

(iii)    Awarding plaintiff's reasonable costs and expenses, including attorneys' fees; and

(iv)    Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: February 27, 2019                JOHNSON FISTEL, LLP


                                        *s/ W. Scott Holleman*
                                        W. SCOTT HOLLEMAN

                                        GARAM CHOE
                                        99 Madison Avenue, 5th Floor
                                        New York, NY 10016
                                        Telephone: 212-802-1486
                                        Facsimile: 212-602-1592
                                        ScottH@johnsonandweaver.com

                                        JOHNSON FISTEL, LLP
                                        FRANK J. JOHNSON
                                        CHASE M. STERN
                                        655 West Broadway, Suite 1400
                                        San Diego, CA  92101
                                        Telephone: 619-230-0063
                                        Facsimile: 619-255-1856
                                        FrankJ@johnsonandweaver.com

                                        *Attorneys for Plaintiff Jeff Bittner*

## <u>CERTIFICATION OF PLAINTIFF PURSUANT</u>
## <u>TO THE FEDERAL SECURITIES LAWS</u>

I, Jeff Bittner, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint with my counsel and authorize its filing.

2. I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4. I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 02/05/2018 | 125 | 73.50 |

When reverse stock split is accounted for:

31 Shares @ $294.00

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| NONE | | |

5. I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.     I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23th day of February 2019.

DocuSigned by:

*Jeffrey David Bittner*

DB3B58AEA10648F...

Jeff Bittner